William B. WEINBERGER, Plaintiff,

v.

UOP, INC. et al., Defendants.

Civil Action No. 5642.

Court of Chancery of Delaware,
New Castle County.

Submitted Oct. 6, 1980.
Decided Feb. 9, 1981.

William Prickett, and George H. Seitz, III, of Prickett, Jones, Elliott & Kristol, Wilmington, for plaintiff.

A. Gilchrist Sparks, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant UOP, Inc.

Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, and Alan N. Halkett, of Latham & Watkins, Los Angeles, Cal., for defendant The Signal Companies, Inc.

R. Franklin Balotti, of Richards, Layton & Finger, Wilmington, for defendant Lehman Brothers Kuhn Loeb, Inc.

BROWN, Vice Chancellor.

This is a decision after trial in a class action brought on behalf of certain former

shareholders of a Delaware corporation. The plaintiff, William B. Weinberger, is a former shareholder of the defendant, UOP, Inc. (hereafter "UOP"). The defendant, the Signal Companies, Inc. (hereafter "Signal") is the former majority shareholder of UOP. It is also a Delaware corporation. On May 26, 1978 a merger was effectuated between UOP and Sigco Incorporated, the latter corporation then being a wholly-owned subsidiary of Signal. As a result of the merger, UOP, as the surviving entity, became the wholly-owned subsidiary of Signal, and UOP's former minority shareholders were paid the sum of $21 per share for their former interests in UOP.

On behalf of the class composed of all UOP shareholders as of May 26, 1978 who have not exchanged their shares for the merger price, plaintiff attacks the validity of that merger transaction on the theory that the price of $21 per share paid to the minority shareholders of UOP was grossly inadequate and that as a consequence the merger was unfair and should be set aside. In the event that the now-completed transaction is too involved to undo, plaintiff, as an alternative, seeks what he would term an "equitable rescission" in the form of either an award of money damages to the former UOP minority shareholders or an award to each member of the class of an appropriate stock interest in Signal. Subsequent to the completion of the trial, plaintiff also filed a motion whereby he seeks to enlarge the class so as to include all former shareholders of UOP as of the time of the merger other than Signal.

Because of the many contentions raised during the course of the proceedings, it becomes necessary to treat the matter at some length. Even in so doing there are matters urged by the plaintiff with which I have not dealt specifically herein. As to any such contentions, however, the fact that they are not specifically mentioned does not mean that they have been overlooked. I have considered everything presented. I set forth hereafter only that which I feel significant to the decision to be made.

## THE DEFENDANTS

The defendants are Signal, UOP, and Lehman Brothers Kuhn Loeb, Inc. (hereafter "Lehman Brothers").

Signal is a diversified, technologically based company operating through various subsidiaries. Two of its wholly-owned subsidiaries are The Garrett Corporation and Mack Trucks, Inc. The former is engaged in the design, engineering, manufacture and sale of transportation related equipment and services, including those involved in the aerospace industry. The latter is similarly involved in the area of heavy-duty motor trucks and truck tractors. Through substantial investments in other companies Signal is also engaged in the manufacture of industrial products, land development, radio and television broadcasting, entertainment and shipping. Its stock is publicly held and is listed on the New York, Philadelphia and Pacific Stock Exchanges.

UOP, formerly known as Universal Oil Products Company, is a diversified industrial company which, as of the beginning of 1978, was engaged in six major lines of business. These included petroleum and petrochemical services and related products, construction, fabricated metal products, transportation equipment products, chemicals and plastics, and other products and services including land development, lumber products, and a process for the conversion of municipal sewage sludge into organic soil supplements. Its stock was publicly held and was listed on the New York Stock Exchange at the time.

The defendant Lehman Brothers is an investment banking firm with a long-standing business relationship with UOP.

## THE RELEVANT FACTS

In 1974 Signal sold another of its wholly-owned subsidiaries, Signal Oil and Gas

Company, for the sum of $420 million in cash. In the process of looking for investments for this cash surplus, it became interested in UOP as a possible candidate for acquisition. To this end, friendly negotiations were initiated between representatives of Signal and UOP. Signal proposed $19 per share as a fair price to pay to obtain a controlling interest in UOP. The representatives of UOP sought $25 per share. In the arm's length bargaining that followed, an understanding was reached between the two companies whereby Signal agreed to purchase from UOP 1.5 million of UOP's authorized but unissued shares for a price of $21 per share. This purchase, however, was made contingent upon Signal making a successful cash tender offer for 4.3 million publicly held shares of UOP, also at a price of $21 per share. The combined acquisition in this manner of 5.8 million shares was designed to give Signal a 50.5 per cent stock ownership interest in UOP. The board of directors of UOP advised the company's shareholders that it had no objection to Signal's tender offer at that price. Immediately prior to the announcement of the tender offer, UOP's common stock had been trading on the New York Stock Exchange at a fraction under $14 per share.

The negotiations between Signal and UOP occurred during April 1975. The resulting tender offer was greatly oversubscribed. Although Signal had sought only 4.3 million shares at $21 per share, some 7.8 million shares (or 78.2 per cent of the total outstanding shares of UOP) were tendered. As a consequence, Signal purchased only 55 per cent of the tendered shares on a prorata basis. Signal did, however, through this tender offer and direct purchase from UOP, achieve its goal of becoming a 50.5 per cent shareholder of UOP.

Thereafter, at UOP's annual meeting, Signal was content to nominate and elect only six members to UOP's thirteen member board of directors. Of these, five were either directors or employees of Signal. The sixth, a partner in the investment banking firm of Lazard Freres & Co., had been one of Signal's representatives in the negotiations and bargaining with UOP concerning the tender offer and purchase price for the UOP shares.

In addition, the president and chief executive officer of UOP retired during 1975, and Signal caused him to be replaced by James C. Crawford, a long-time employee and Senior Executive Vice President of The Garrett Corporation, one of Signal's wholly-owned subsidiaries. Crawford also replaced his predecessor on UOP's board of directors. He also was made a director of Signal.

Shortly after Crawford assumed his duties as president and chief executive officer of UOP, he, along with Signal, became aware for the first time of a major financial problem with regard to a refinery constructed by one of UOP's divisions at Come-By-Chance, Newfoundland. Eventually, the Come-By-Chance refinery operation ended in bankruptcy, as a result of which UOP suffered for 1975 an unanticipated operating loss of some $35 million. In addition, lawsuits were filed against UOP and its subdivisions seeking some $189 million in damages as a result of the Come-By-Chance venture. These suits were still pending at the time of the events complained of herein, and although UOP's management feels that the claims are defensible and that they will not result in any serious consequences to UOP's financial condition, their existence caused the financials for both UOP and Signal to be qualified for the year ending December 31, 1977.

In the two years following UOP's disastrous 1975 performance, its fortunes steadily improved so that by the end of 1977 UOP's earnings and operating record had substantially neared its performance for 1974, the year immediately preceding Signal's acquisition of its majority interest. For example UOP's gross revenues for 1977 were some $730 million as compared to $781 million in 1974; its income from continuing operations before extraordinary items was $24.3 million in 1977 as compared to $24.6

million in 1974; its net income per share was $2.74 (including an extraordinary item of $0.62 per share) in 1977 as compared with $2.78 (including $0.32 per share from discontinued operations) in 1974.

Sandwiched between this, UOP had suffered the $35 million unexpected loss in 1975, or a net loss of $3.19 per share, but a net income of $23.5 million in 1976 representing a net income of $2.06 per share. In other words, the figures indicated that the Come-By-Chance disaster was an unusual occurrence, and that by the end of 1977 UOP looked to be the same company that had attracted Signal for its investment potential in 1975.

During this same lapse of time, Signal had been largely unsuccessful in finding other suitable investment candidates for its excess cash. It had entered into talks with two other companies during 1977, but neither proposed transaction came to fruition. Accordingly, by February 1978, Signal had no other realistic alternatives (it only sought acquisitions at the time on a friendly basis), and therefore it again looked to UOP.

At the instigation of certain of Signal's management personnel, including William E. Walkup, its board chairman, and Forrest N. Shumway, its president, it caused a feasibility study to be made concerning the possible acquisition of the balance of UOP's outstanding shares. This study was performed by two officers of Signal, Messers. Arledge and Chitea, both of whom were also directors of UOP and who had been placed in that position by Signal. The report of Arledge and Chitea indicated that it would be a good investment for Signal to acquire the remaining 49.5 per cent of UOP at any price up to $24 per share.

This report was discussed between Walkup and Shumway who, along with Arledge, Chitea and Brewster L. Arms, internal counsel for Signal, constituted Signal's senior management personnel. In particular, there was discussion as to what the proper price should be if the acquisition was to be pursued, keeping in mind that as a majority shareholder Signal owed a fiduciary responsibility to the minority shareholders of UOP as well as to its own shareholders. It was ultimately concluded that a meeting of Signal's Executive Committee would be called and that it would be proposed to that group that Signal, through the merger process, acquire the remaining outstanding stock interests in UOP at a price within the range of $20 to $21 per share.

The Executive Committee meeting was set for February 28, 1978. Although he was not a member of Signal's Executive Committee, word was sent to Crawford in Des Plaines, Illinois, UOP's headquarters, asking him to attend Signal's Executive Committee meeting in Los Angeles. On his arrival, and prior to the meeting, Crawford was asked to meet privately with Walkup and Shumway. At that time, as a courtesy to Crawford according to Signal, Crawford was advised as to what was happening, and specifically he was asked, as president of UOP, for his reaction to the proposed price range of $20 to $21 per share. Crawford stated that he thought that such a price would be "generous" and that it was certainly one that should be submitted to UOP's minority shareholders for their ultimate determination. He further stated, however, that 100 per cent ownership of UOP by Signal could give rise to internal problems at UOP. Employees, he felt, would have to be given some assurance of their future place in a fully Signal-owned operation. Otherwise he feared the departure of key personnel. Also, many of UOP's key employees had stock option incentive programs which would be wiped out by a merger, and Crawford felt that some adjustment would have to be made, such as to provide a comparable incentive as to Signal shares, if he was to maintain his level of personnel and efficiency at UOP following the merger. At the same time, he voiced no objection to the price range proposed, nor did he suggest that Signal should consider paying more than $21 per share for the minority interests.

Later, at the Executive Committee meeting, these same considerations were discussed, with Crawford taking a similar position. Also considered was the 1975 tender offer and the fact that it had been greatly oversubscribed by UOP shareholders at $21 per share. In addition Signal was confronted with an image problem in that, as controlling shareholder of UOP, it was required under accounting procedures to take into account 100 per cent of UOP's debts and sales, but by the same token it could take only 50.5 per cent of UOP's earnings. This factor tended to distort Signal's own debt/sales-equity ratios, making its stock appear less attractive in the market place. The acquisition of the balance of UOP's shares provided the solution to this situation.

As a result of these and other factors which made the acquisition of 100 per cent ownership of UOP seem advisable from Signal's standpoint, and based upon the consensus that a price of $20 to $21 per share would be fair for Signal as well as for the minority shareholders of UOP, Signal's Executive Committee authorized its management "to negotiate" with UOP "for a cash acquisition of the minority ownership in UOP, Inc. with the intention of presenting a proposal to the Board of Directors of [Signal] on March 6, 1978." Immediately following this February 28, 1978 meeting, Signal issued a press release in which it was stated as follows:

"The Signal Companies, Inc. and UOP, Inc. are conducting negotiations for the acquisition for cash by Signal of the 49.5 per cent of UOP which it does not presently own, announced Forrest N. Shumway, president and chief executive officer of Signal, and James V. Crawford, UOP president.

"Price and other terms of the proposed transaction have not yet been finalized and would be subject to approval of the boards of directors of Signal and UOP, scheduled to meet early next week, the stockholders of UOP and certain federal agencies."

The press release further revealed that the closing price of UOP's common stock on February 28, 1978, was $14.50 per share.

Two days later, on March 2, 1978, Signal issued a second press release in which it announced that its management would be recommending a price in the range of $20 to $21 per share for UOP's 49.5 per cent minority interest. The press release pointed out that Signal had previously announced that "negotiations" were being conducted for Signal's acquisition of this minority interest.

Between February 28, 1978 and Monday, March 6, 1978, Crawford was in contact by telephone with all of UOP's non-Signal directors. Also during that period Crawford retained the services of the defendant Lehman Brothers for the purpose of rendering an opinion as to the fairness of the price to be paid the minority for their shares. He selected Lehman Brothers for two reasons. First, the time schedule between the announcement and the board meetings was short (only three business days) and since Lehman Brothers had been acting as UOP's investment banker for many years, he felt that it would be in the best position to respond on such short notice. Secondly, James W. Glanville, a long-time director of UOP, was also a partner of Lehman Brothers and had long acted as a financial advisor to UOP. Crawford felt that Glanville's familiarity with UOP as a member of its board as well as being a member of Lehman Brothers would also be of assistance in enabling Lehman Brothers to render an opinion within the existing time constraints.

Crawford telephoned Glanville for this purpose and, in response to this inquiry, Glanville gave his assurance that Lehman Brothers had no conflicting interests such as would prevent it from undertaking the task. Glanville also gave his personal reaction that a price in the range of $20 to $21 would certainly be fair since it represented almost a 50 per cent premium over UOP's market price. Glanville sought a fee of $250,000 for Lehman Brothers for providing

the requested fairness opinion. Crawford thought this too much and, as a result of the discussions that followed, Glanville finally agreed that Lehman Brothers would furnish the opinion for $150,000.

During this period Crawford also had several telephone contacts with Signal officials. In only one of them, however, was the price to be paid for the shares discussed. In a conversation with Walkup, Crawford advised that as a result of his communications with UOP's non-Signal directors it was his feeling that the price to be paid would have to be the top of the proposed price range, or $21 per share, if the approval of UOP's outside directors was to be obtained. Again, however, he did not seek any price higher than $21 per share.

Having undertaken to provide a fairness opinion, Glanville assembled a three-man Lehman Brothers team to do the work. These persons examined relevant documents and information concerning UOP, including its annual reports and its Securities and Exchange Commission filings from 1973 through 1976 as well as its audited financial statements for 1977, its interim reports to shareholders, and its recent and historical market prices and trading volumes. In addition, on Friday, March 3, 1978, two members of the Lehman Brothers team flew to UOP's headquarters in Des Plaines to perform a "due diligence" visit, during the course of which they interviewed Crawford as well as UOP's general counsel, its chief financial officer, and other key executives and personnel.

As a result of these efforts, the Lehman Brothers team concluded that "the price of either $20 or $21 would be a fair price for the remaining shares of UOP." They telephoned this impression to Glanville, who was spending the weekend in Vermont.

On Monday morning, March 6, 1978, Glanville and the senior member of the Lehman Brothers team flew to Des Plaines to attend the scheduled UOP directors meeting. Glanville looked over the assembled information during the flight. The two had with them the draft of a "fairness opinion letter" in which the price had been left blank. Either during or immediately prior to the directors' meeting that followed, the two page "fairness" letter was typed in final form and the price of $21 per share was inserted.

At the appointed time on March 6, 1978 the meetings of both Signal's board and UOP's board were convened. Telephone communications were maintained between the two meetings. Walkup attended UOP's meeting so as to be able to present Signal's position and answer any questions that UOP's non-Signal directors might have. All of UOP's non-Signal directors were present for the meeting either in person or by means of conference telephone.

First, Signal's board unanimously adopted a resolution which authorized Signal to propose to UOP a cash merger at $21 per share as outlined in a certain merger agreement and other supporting documents. Of significance, Signal's proposal required that the merger would have to be approved by a majority of UOP's outstanding minority shares voting at the shareholders meeting at which the merger would be considered and, in addition, that the minority shares voting in favor of the merger, when coupled with Signal's 50.5 per cent interest, would have to comprise at lest two-thirds of all UOP shares. Otherwise the proposed merger would be deemed disapproved.

UOP's board then proceeded to consider the proposal. Copies of the proposed agreements were delivered to the directors in attendance. (Copies had been forwarded earlier to the directors participating by telephone.) They also had before them financial data for UOP for the years 1974 through 1977, UOP's most recent financial statements, market price information and budget projections for 1978. In addition, they were presented with Lehman Brothers fairness opinion letter, as to which Glanville made comments concerning the information which had gone into its preparation.

After discussions on the matter, Walkup and Crawford left the meeting, the purpose

being to permit a free and uninhibited exchange between UOP's non-Signal directors. A resolution to accept Signal's offer was then proposed. Walkup and Crawford returned to the meeting, and Signal's other four directors on UOP's board were placed in telephone communication.

On the advice of counsel, Walkup, Shumway, and UOP's other three Signal directors abstained from voting. All five indicated, however, that if they had voted they would have voted in favor of the resolution. The remaining UOP directors, including Crawford and the representative of Lazard Freres & Co. nominated to the board by Signal, all voted in favor of the resolution, and thus approved the merger on terms proposed by Signal.

On March 7, 1978, UOP sent a letter to its shareholders advising them of the action taken by UOP's board with respect to Signal's offer. In this letter it was pointed out, among other things, that on February 28, 1978 "both companies had announced negotiations were being conducted."

Despite the foregoing swift action taken by the boards of the two companies, the vote on the merger was not submitted to UOP's shareholders until UOP's annual meeting on May 26, 1978. In the Notice of Annual Meeting and Proxy Statement sent to shareholders in May, UOP's management and board urged that the merger be approved. In the proxy statement, UOP's shareholders were also advised as follows:

"The price was determined after *discussions* between James V. Crawford, a director of Signal and Chief Executive Officer of UOP, and officers of Signal which took place during meetings on February 28, 1978, and in the course of several subsequent telephone conversations." (Emphasis added.)

Initially the word "negotiations" had been used rather than the word "discussions" in the original draft of the Proxy Statement. However, when the Securities and Exchange Commission sought the details of the "negotiations" as part of its approval of the Proxy Statement, the term was deleted and the word "discussions" substituted in its place.

The Proxy Statement further indicated that the vote of UOP's board in approving the merger had been unanimous. It also advised the shareholders that the investment banking firm of Lehman Brothers had given its opinion that the merger price of $21 per share was fair to the minority shareholders of UOP. A copy of the Lehman Brothers opinion letter was attached.

As of the record date for the Annual Meeting there were 11,488,302 shares of UOP common stock outstanding. Of those shares, 5,688,302 were owned by shareholders other than Signal.

At the meeting only 56 per cent, or 3,208,652, of the minority shares were voted. Of these 2,953,812 voted in favor of the merger and 254,840 voted against it. Thus, of the minority shares voted, the merger was approved by a ratio of nearly 12 to 1. When Signal's shares were added to the minority shares voting in favor, a total of 76.2 per cent of UOP's outstanding shares voted for the merger while only 2.2 per cent opposed it.

Computed another way, however, and as plaintiff would prefer to view it, 43.6 per cent of the minority shareholders did not vote at all, and 7.9 per cent of those who did voted against the merger. In other words, while the merger was overwhelmingly approved by the 56 per cent of the minority shareholders who actually took the trouble to vote, the merger was only approved by slightly more than 50 per cent of all the minority shareholders who were entitled to vote.

Under the terms of the agreement, however, the merger became effective on May 26, 1978, and each share of UOP stock, other than those owned by Signal, was automatically converted into a right to receive $21 in cash.

## CONTENTIONS

Based upon these facts, and others as mentioned hereafter, plaintiff contends that

Signal has unfairly used its majority stock ownership position in UOP to cash out UOP's 49.5 per cent minority at a price per share which is grossly inadequate to the minority shareholders. Specifically, plaintiff charges that there was no legally proper purpose for the merger since it was brought about by Signal solely to further its own economic interests, and thus to rid itself of the minority shareholders.

In addition, plaintiff says that Signal abused its majority position by causing its controlled board and management of UOP to disseminate proxy information to its minority shareholders which misrepresented and failed to disclose the true manner in which the merger price had been established, thus misleading a majority of the minority shareholders into voting to approve the merger, and thus, by such wrongful conduct, vitiating the approval given by the 12 to 1 vote of the voting minority shareholders. In this regard, plaintiff says that UOP failed to disclose that the Lehman Brothers fairness opinion was not the result of any true evaluation of the worth of UOP shares, but rather was merely the personal, off-the-cuff opinion of Glanville supported by a perfunctory and hurried investigation by his subordinates at Lehman Brothers. He also charges a conflict of interest on the part of Lehman Brothers and a conspiracy by it with Signal and the Signal-controlled management of UOP so as to make it appear that Lehman Brothers had given a considered and impartial opinion as to the fairness of the merger price.

Plaintiff also charges that the press releases given by Signal as well as the proxy information disseminated by UOP was misleading in that they indicated that "negotiations" had been held between Signal and UOP when in fact no one negotiated on behalf of UOP's minority to get anything more than $21, the top price offered by Signal from the beginning.

Third, plaintiff contends that UOP's board, as controlled by Signal, failed in the fiduciary duty which it owed to UOP's mi-

nority in that, in addition to failing to negotiate for a higher price, it did not require an appraisal of the value of UOP's shares prior to agreeing to the merger terms and, also, that it failed to take into consideration the value of substantial assets of UOP in determining that $21 per share was fair to the minority.

Finally, plaintiff contends that the true value of UOP's minority shares at the time of the merger was not less than $26 per share, and accordingly he argues that, all other factors aside, the price paid to the minority was grossly inadequate, and thus unfair. To this end, plaintiff offered expert testimony in support of his position that $26 was the minimum price that Signal should have been required to pay in return for the right to acquire 100 per cent ownership of UOP.

The defendants, on the other hand, deny that Signal's purpose was in any way illegal. They deny that any misrepresentations were made to UOP's minority in either the proxy materials or the press releases. They say that there were actual negotiations leading up to the terms of the merger, that UOP's board properly considered the matter based upon adequate information, and that the fairness opinion was that of Lehman Brothers, not Glanville, and was uninfluenced in any way by either Signal or UOP. They deny any conspiracy with Lehman Brothers to defraud UOP's minority. They contend that the $21 per share, representing more than 40 per cent premium over market as of March 6, 1978, was fair under any realistic analysis of UOP's shares at the time, and that in any event, the terms of the merger were overwhelmingly ratified by those most directly effected, namely, UOP's minority, thereby, in view of what the defendants feel has been the plaintiff's inability to establish fraudulent conduct on the part of the defendants in the presentation of the proxy materials to the minority, removing the matter from further scrutiny by the Court.

## THE LEGAL STANDARD TO BE APPLIED

In order to evaluate these contentions, it is necessary first to resolve the disagree-

ment between the parties as to the proper legal standard to be applied. Prior to the trial of this case the defendants had moved to dismiss the original complaint filed by the plaintiff on the grounds that it failed to state a cause of action. That motion was granted. See *Weinberger v. UOP, Inc.*, Del.Ch., 409 A.2d 1262 (1979).

Plaintiff's original complaint had tracked the complaint filed in the case of *Singer v. Magnavox Co.*, Del.Supr., 380 A.2d 969 (1977). Without relying upon any particular allegations of fraud or alleged acts of misconduct, the complaint simply alleged Signal's controlling stock position in UOP, recited the facts indicating that a merger had taken place whereby Signal had become the 100 per cent owner of UOP in return for a payment of cash to UOP's former minority shareholders, and charged that Signal had thereby breached the fiduciary duty owed by it to UOP's minority by cashing out the minority without a proper business purpose and for a grossly inadequate price per share. In the process, however, the original complaint also revealed in its allegations that the merger had been structured so as to leave the decision as to its approval or rejection to the majority vote of those minority shareholders of UOP who elected to vote their shares on the issue.

Because of this latter circumstance, it was held that the original complaint did not allege a use of the corporate voting machinery by Signal as majority shareholder so as to bring about a corporate act in violation of the fiduciary duty owed by it to the minority—such as had been the situation in *Singer* as well as in the subsequent decision of *Roland Intern. Corp. v. Najjar*, Del.Supr., 407 A.2d 1032 (1979). Plaintiff was given leave, however, to amend his complaint so as to allege the specific acts of fraud, misrepresentation, etc. on which he then claimed to be relying in order to demonstrate the unfairness of the merger terms to UOP's minority. Reference is made to that previous decision for a more detailed explanation. Plaintiff then filed an amended complaint, the allegations of which set forth the issues for determination herein.

As a result of the foregoing, defendants have argued that the *Singer* rationale has been removed from the proceeding, and that the burden has shifted to the plaintiff to prove his charges of fraud, conspiracy and misrepresentation. They argue that on the evidence he has failed to carry that burden and that as a consequence the case is at an end.

Plaintiff, in reliance on *Singer, Roland International* and *Tanzer v. International General Industries, Inc.*, Del.Supr., 379 A.2d 1121 (1977), the latter being the intervening decision in the *Singer* trilogy, argues that the burden is still on the defendants (primarily Signal) to demonstrate the entire fairness of the merger to the minority, and that on the evidence they have failed to carry that burden. Thus, the point of disagreement on the legal standard to be applied.

The decisions in *Singer, Tanzer* and *Roland International* have bred some uncertainty in this Court as well as, I think it fair to say, among members of the corporate bar concerning the present status of litigation wherein a cash out merger effectuated by a majority shareholder is attacked in a class action brought by a member of the cashed out minority. From a repeated reading of those decisions, I am not convinced that the situation has been complicated to the extent that at first it might appear. I therefore offer my understanding of the effect of these decisions, and apply the conclusions to the facts of this case, with the hope that my interpretation is the correct one.

To begin with, *Singer*, by its terms, did not purport to deviate from existing law. It is founded on the long standing principle that a majority shareholder owes a fiduciary duty of entire fairness to minority shareholders in a merger context wherein the equity position of the minority in a merged corporation is being affected. It is significant that in *Singer*, after reviewing various Delaware precedents dealing with

the subject of fiduciary duty, the Supreme Court stated as follows at 380 A.2d 979:

"Read as a whole, those opinions illustrate two principles of law which we approve: First, it is within the responsibility of an equity court to scrutinize a corporate act when it is alleged that its purpose violates the fiduciary duty owed to minority stockholders; and second, those who control the corporate machinery owe a fiduciary duty to the minority in the exercise thereof over corporate powers and property, and the use of such power to perpetuate control is a violation of that duty.

"By analogy, if not *a fortiori*, use of corporate power solely to *eliminate* the minority is a violation of that duty."

The Court then went on to state, however, that even if it be found that the majority shareholder has a purpose other than that of freezing out the minority shareholders, such a finding will not establish that it has fulfilled its fiduciary duty. Rather, it stated that under the rule of *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 93 A.2d 107 (1952), the merger transaction must still be examined for entire fairness.

From this, the only thing that I can see that *Singer* specifically added to the existing law is its apparent announcement that a use of a controlling shareholder position through the merger process for no purpose other than to eliminate the minority interests for cash, regardless of the amount paid therefor, is a violation of the duty of fairness owed by a majority shareholder to the minority.

Later, in *Roland International*, the Supreme Court reaffirmed and applied the *Singer* decision in the context of a short form merger under 8 *Del.C.* § 253. Both *Singer* and *Roland International* dealt primarily with the fiduciary duty of a majority shareholder in using its corporate power to produce a predetermined effect upon the minority. This is so because in both *Singer* and *Roland International* it was assumed that the power of the majority shareholder was being used for an improper purpose. This is so because both decisions involved a motion to dismiss the complaint for failure to state a claim wherein it was alleged in each complaint, and thus assumed as true for the purpose of the motion, that there was no purpose for the merger other than to eliminate the minority shareholders. In contrast, the decision in *Tanzer* addressed itself more specifically to what might or might not constitute an improper purpose.

In *Tanzer* the Supreme Court held that a majority shareholder has "a right to look to its own corporate concern in determining how to conduct [its subsidiary's] affairs, including a decision to cause it to merge." 379 A.2d 1124. At the same reference the Court went on to state as follows:

"Although we have stated that IGI is entitled as majority stockholder to vote its own corporate concerns, it should be clearly noted that IGI's purpose in causing the Kliklok merger must be *bona fide*. As a stockholder, IGI need not sacrifice its own interest in dealing with a subsidiary; but that interest must not be suspect as a subterfuge, the real purpose of which is to rid itself of unwanted minority shareholders in the subsidiary. That would be a violation of *Singer* and any subterfuge or effort to escape its mandate must be scrutinized, with care and dealt with by the Trial Court. And, of course, in any event, a *bona fide* purpose notwithstanding, IGI must be prepared to show that it has met its duty, imposed by *Singer* and *Sterling v. Mayflower Hotel Corp.*, Del.Supr., 33 Del.Ch. 293, 93 A.2d 107 (1952), of 'entire fairness' to the minority."

The Court then went on to approve the Chancellor's finding that as majority shareholder IGI had a "legitimate and present and compelling" business reason to be the 100 per cent owner of the subsidiary and that it had not exercised its voting power just for the purpose of freezing out the minority. Thus it expressly found that no violation of *Singer* had been shown.

Further, in *Tanzer*, the Supreme Court noted that at the preliminary injunction hearing the Chancellor had discussed fairness "only in terms of the price offered for the stock." It held that such an analysis was too restrictive. In conclusion, it was stated as follows at 379 A.2d 1125:

"The test required by *Singer*, which applied the rule of *Sterling*, involves judicial scrutiny for 'entire fairness' as to all aspects of the transaction."

Thus, both *Singer* and *Tanzer* start and finish with *Sterling*. *Singer* says that a use of the corporate machinery for no purpose other than to cash out the minority is wrong; however, proof of a purpose other than such a minority freeze out does not end the matter and there still must be a hearing under the standard of *Sterling*. *Tanzer* says that a cash out merger is permissible if the purpose is to further the interests of the majority shareholder, provided that the purpose is *bona fide* and not merely a subterfuge to enable the majority shareholder to rid itself of the unwanted minority; however, even if the purpose is *bona fide*, there still must be a hearing under the standard of *Sterling*, and at such a hearing it is not sufficient to limit the issue to price alone. Rather, price must be considered along with any other relevant factors. (Compare for instance, *David J. Greene & Co. v. Dunhill International, Inc.*, Del.Ch., 249 A.2d 427 (1968) cited in *Singer*, wherein it was held, among other things, that it was necessary to consider if the majority shareholder had usurped a corporate opportunity belonging to the subsidiary prior to the merger in order to ascertain, under the *Sterling* test, if the consideration being offered to the minority was fair.)

*Sterling*, then, is the bedrock on which *Singer*, *Tanzer* and *Roland International* are built. It is still the law, and it is still the final word even if it appears on the evidence that there is no violation of anything new that has been announced in *Singer* and *Tanzer*. Thus, the analysis must turn to *Sterling*.

That case involved a merger initiated by Hilton Hotels Corporation ("Hilton"), the owner of more than 80 per cent of the outstanding shares of Mayflower Hotel Corporation ("Mayflower"). Under the terms of the merger proposed by Hilton, and accepted by the Mayflower board as nominated by Hilton, the minority shareholders of Mayflower were to receive one share of Hilton stock for each share of Mayflower stock owned by them. Certain of Mayflower's minority shareholders brought suit in this Court to enjoin the consummation of the merger on the grounds that the terms of the merger agreement were "both fraudulent and unfair" to Mayflower's minority. *Sterling v. Mayflower Hotel Corp.*, Del.Ch., 89 A.2d 862 (1952). On the appeal of the Chancellor's decision, it was noted by the Supreme Court at the outset of its opinion that "[t]he principal question presented is whether the terms of [the] proposed merger . . . are fair to the minority stockholders of Mayflower." 93 A.2d 108.

The thrust of the plaintiffs' argument in *Sterling* was that in view of the fact that Hilton was acquiring all of the assets of Mayflower by virtue of becoming the 100 per cent owner of Mayflower as a result of the merger, the real value of the Mayflower shares in the hands of its minority shareholders greatly exceeded the market value of the Hilton shares that they were to receive in exchange under the terms of the merger agreement. Plaintiffs also charged that Mayflower's directors, as elected by Hilton, had entered into the merger agreement in bad faith, primarily because they had given no consideration to the net asset value of the Mayflower shares that were being taken from the minority.

Thus, even though *Sterling* involved a stock-for-stock exchange rather than a payment of cash as was the case in *Singer* and *Tanzer*, the unfairness complained of by the minority shareholders went to the value of that which they were receiving in return for being deprived of their Mayflower shares as a result of the vote of the majori-

ty shareholder. In other words, they were contending that the value (or price) being given them in return for their forced removal from Mayflower's corporate enterprise was grossly inadequate.

In addressing this issue, the Supreme Court announced again the settled Delaware rule for which *Sterling* is most often cited, namely, that since Hilton and Hilton's Mayflower directors stood on both sides of the transaction they thereby occupied a fiduciary position on relation to Mayflower's minority shareholders in dealing with Mayflower's property, and as a consequence they bore the burden of establishing the entire fairness of the merger transaction under the careful scrutiny of the courts. Having so stated, the Supreme Court proceeded to review the evidence presented to the Chancellor and his findings thereon in view of the contentions made by the plaintiffs and the arguments offered in opposition thereto on behalf of Hilton. Based upon this review the Supreme Court agreed with the Chancellor that no fraud or unfairness had been shown. In the context of the matter, the decision reached in both Courts constituted a finding that on the evidence presented, viewed in light of the plaintiffs' charges, each minority shareholder of Mayflower was receiving "the substantial equivalent in value of the shares he had before the merger" (see 93 A.2d 110), that Mayflower's Hilton-controlled directors had not been derelict in their fiduciary duty concerning the net asset value issue (see 93 A.2d 116), and that on the whole the defendants had carried their burden of establishing the entire fairness of the terms of the merger to the minority.

What, then, is the effect of *Sterling* when now viewed in light of *Singer, Tanzer* and *Roland International*? I perceive it to be as follows.

*Sterling* stands for the proposition that where a majority shareholder stands on both sides of a merger transaction which will result in the forced removal of the minority shareholders of the subsidiary in exchange for something of value for their minority shares, and where the transaction is attacked in a suit in this Court by or on behalf of the minority shareholders on the grounds that the value being offered is inadequate and that the majority shareholder has breached its fiduciary duty in some way because of the manner in which the exchange or conversion value was agreed upon or determined, then this Court has a duty to examine all pertinent elements of the entire transaction so as to make sure that the minority is being treated fairly.

■ During the course of this examination, the ultimate burden is on the majority shareholder to show by a preponderance of the evidence that the transaction is fair. However, it is not the obligation of the majority shareholder to come forward with evidence in the first instance. Rather, it is the burden of the plaintiff attacking the fairness of the merger to demonstrate some need to invoke this obligation on the part of the majority shareholder. The plaintiff must charge that for some reason the terms of the merger are unfair to the minority, and must come forward initially with, some proof and argument in support thereof. As in *Sterling*, it is an adversary proceeding which must be decided on the evidence. It is the responsibility of the plaintiff to demonstrate some basis for the charge that the terms are unfair to the minority. Once done, the majority shareholder has the burden of coming forward with evidence to refute such charges and to demonstrate on all the evidence that the minority shareholders have been treated fairly.

This is what was done in *Sterling*. Under *Singer, Tanzer* and *Roland International*, this Court must apply the rule of *Sterling*. Therefore, *Sterling's* obligation should go no further now than it did then. In other words, a plaintiff cannot simply complain that the merger is unfair and thereby require the majority shareholder to come forward and spread all the elements of the transaction before this Court for investigation and review. The examination in this

Court is judicial—on the evidence presented in an adversary context—not administrative. I reach this conclusion because from a reading of the reported opinions of both the chancellor and the Supreme Court in Sterling, I can find no indication that either decision was based upon anything other than the evidence and legal arguments offered by the plaintiffs in support of their charges on the one hand, and on the evidence and arguments of the defendants offered in response thereto on the other.

Thus, when the Supreme Court in Sterling approved the rule to be that "to arrive at a judgment of the fairness of the merger, all of its terms must be considered" 93 A.2d 114, it would seem that it must be taken in the context in which it was made, and that "all" of the terms or elements which must be considered are those which are developed directly by, which relate to or which result from the evidence produced in support of the issues framed by the pleadings. In other words, the scope of the elements or factors to be considered must of necessity vary with the nature of the situation with which the Court is presented in a given case. This leads to the importance of inger and Tanzer.

Singer reaffirms the basic principles of Sterling and specifically applies them to an interested merger situation in which the minority shareholders are being given a cash payment for their shares rather than a value-equivalent interest in the surviving corporation. The amplification which Singer seems to provide is its indication that the "purpose" of the majority shareholder in seeking such a merger is a specific element or factor which must be considered in evaluating its fairness to the minority, and that if there is no purpose other than to rid the enterprise of its minority shareholders, it is a violation of the majority shareholder's fiduciary duty, and therefore wrong. Secondarily, and as a necessary corollary, Singer says that if the purpose for the merger is improper and is thus unfair to the minority, it is further a wrong for the majority share-holder to exercise its voting control so as to bring it about.

Tanzer goes further, and says that in evaluating the fairness to the minority, it is not necessarily wrong for a majority shareholder to merge out the minority in furtherance of its own private interests provided that its purpose is a *bona fide* one, and in this regard "*bona fide*" is used in the sense of not being a mere subterfuge to get rid of the minority. In other words, the *bona fide* nature of the majority shareholder's alleged purpose is now specifically made another element or factor which this Court must consider in scrutinizing the transaction for "entire fairness" to the minority.

As such, as I view them, Singer and Tanzer simply establish specific factors which must now be considered when such a cash out merger is being attacked as being unfair because of an alleged inadequacy of price. These factors are in addition to anything else that might be brought into consideration under Sterling based upon the circumstances of the particular transaction involved.

■ Applying this analysis to the present case, I reach the following conclusions. The fact that Signal and UOP structured the merger so that it had to be approved by a majority of the minority shareholders voting on the issue does not remove them from the burden imposed by Sterling. The dismissal of the original complaint for failure to state a claim because of the manner in which the vote was structured simply ruled out that one element or factor, namely, the use of its controlling voting position by Signal, from being potentially determinative of the matter. It was simply a finding that Signal did not use its *voting power* to bring about the merger for an improper purpose, as proscribed by Singer. It was not a finding that Signal in no way whatever used its majority position so as to cause UOP's minority to be merged out, nor did it represent any finding as to Signal's purpose.

Since the merger terms were proposed by *Signal* and agreed to by UOP's board which at least it superficially controlled, Signal (as it has always conceded) still stood on both sides of the transaction and therefore, under *Sterling,* still owed a fiduciary duty to UOP's minority in dealing with UOP's property. The evaluation of the purpose element as required by *Tanzer,* as well as a consideration of the other challenged factors which went into the decision to fix the merger price at $21 per share, was not obviated by Signal's decision to leave the vote in the hands of the minority.

This is borne out by the decision of the Supreme Court in *Tanzer.* There the purpose was found to be a proper one in the sense of not being a subterfuge, and it was specifically held as a consequence that there was no misuse of the majority voting position and thus no violation of *Singer* in that regard. Yet it was still held that a further hearing was required, thus indicating that despite the fact that there was no misuse of its controlling voting position by the majority shareholder, its duty of demonstrating the entire fairness of the transaction had not been thereby discharged. This is no different than the status brought about here by the previous dismissal of the plaintiff's original complaint.

The defendants here, rather than standing on their interpretation of the applicable legal standard to be applied to the plaintiff's case, went on to offer evidence to refute the plaintiffs charges of wrongdoing and inadequate price. Consequently, I review the evidence hereafter in light of the overall burden imposed on the defendants to demonstrate the entire fairness of the merger terms to the minority shareholders of UOP.

## AS TO LEHMAN BROTHERS

Initially, I dispose of the charges against Lehman Brothers. Plaintiff says that Lehman Brothers conspired with Signal and its controlled UOP board of directors to deceive UOP's minority shareholders into voting to approve the terms of the merger. The basis of this assertion is that Lehman Brothers was actually working in the interests of Signal rather than UOP's minority in rendering its fairness opinion. This allegation arises from the following factors.

As noticed previously, Lehman Brothers was involved in the 1975 tender offer whereby Signal gained its controlling interest in UOP. Through Glanville and others it advised UOP with regard to the approval of Signal's ultimate tender offer price.

After the Tender offer and stock purchase transaction wherein Signal acquired its 50.5 per cent interest, personnel at Lehman Brothers, apparently at the instigation of Glanville, worked up a study and evaluation purporting to show the benefit that could be gained by Signal in acquiring the balance of UOP's outstanding shares. That report, designated as Exhibit LB–40 at trial, was entitled "*Memorandum to Mr. Forrest Shumway—Confidential Draft—Considerations Relating to the Signal Companies' Investment in UOP—Lehman Brothers Incorporated—June 1976.*" The basic conclusion of LB–40 was that it would be to Signal's advantage to acquire the 49.5 per cent minority interest of UOP at a price of $17 to $21 per share. Plaintiff says that the existence of this document clearly reveals that the hurried Lehman Brothers fairness opinion was geared toward that which was a good deal for Signal rather than to a price which was fair to UOP's minority shareholders.

Moreover, plaintiff observes that since this confidential analysis was performed in 1976, it was necessarily done hard after the 1975 Come-By-Chance disaster which caused UOP to suffer a $35 million operating loss for 1975. If it was the feeling of Lehman Brothers that UOP was a good investment for Signal in 1976 at $21 per share despite its poor 1975 performance, plaintiff wonders how Lehman Brothers could have seriously suggested in 1978 that $21 was a fair price to the minority in view of UOP's vastly improved performance in

1976 and 1977. He suggests that the answer lies in the fact that Lehman Brothers was really acting in the interests of Signal and not UOP's minority.

On the surface, plaintiff's assumption appears eminently reasonable. The evidence, however, indicates otherwise. Specifically, the evidence indicates that LB–40 was an internal document of Lehman Brothers which was apparently filed away after its completion. There is no indication that it was ever shown to Glanville. It is undisputed that it was never sent to either Signal or UOP. Neither Crawford, nor Walkup or Shumway ever saw the document until it was presented to them during discovery in this case, which was long after the terms of the merger had been set and the transaction consummated. During the preparation of the fairness opinion, the member of the Lehman Brothers team who was charged with compiling statistical data came across LB–40 in the files and utilized some of the statistical compilations contained in it. But there is no evidence that its reasoning and conclusions were relied upon by the Lehman Brothers personnel in March 1978 when the fairness opinion was being formulated. Nor was Crawford aware of it when he retained Lehman Brothers after he had questioned Glanville concerning any conflict of interest. Nor was anyone at Signal aware of its existence prior to the consummation of the merger. Suspicious though the document may be, that is the status of the evidence.

Thus, even if Glanville, and through him, Lehman Brothers, can be charged with some responsibility for knowing of the existence of LB–40 prior to the fixing of the merger price, the uncontroverted lack of knowledge on the part of anyone at either Signal or UOP undercuts the plaintiff's conspiracy charge. Quite simply, they could not conspire based upon something about which they had no knowledge.

■ Aside from this there is nothing to show a conspiracy between Signal, UOP and Lehman Brothers. While there is apparently no Delaware case precedent on the point, it is stated as a general principle that in order to establish a civil conspiracy it is necessary to show the combination of two or more persons for an unlawful purpose, or a combination for the accomplishment of a lawful purpose by unlawful means. In addition, while the essence of the crime of conspiracy is the agreement, the essence of a civil conspiracy is damages. In other words, absent damages, there is no cause of action for a civil conspiracy. 16 *Am.Jur.2d,* Conspiracy § 49; 15A *C.J.S.* conspiracy § 1(1).

■ Here there is no evidence of any understanding or overt combination between Signal, UOP and Lehman Brothers to shortchange the interests of UOP's minority. Nor, as will be set forth hereafter, is there convincing evidence that UOP's minority was damaged monetarily at the merger price of $21 per share. In addition, although Lehman Brothers has been lumped together with Signal and UOP in plaintiff's allegations of breach of fiduciary duty, plaintiff has offered no authority to indicate that an investment banking firm rendering a fairness opinion as to the terms of a merger owes the same fiduciary duty to the minority shareholders as does the majority shareholder who initiated the merger as a direct result of being retained by the management of the controlled subsidiary.

Accordingly, judgment will be entered in favor of Lehman Brothers.

## THE PURPOSE FOR THE MERGER

I next turn to the purpose element, which, as I interpret *Singer,* must be considered even though Signal, as majority shareholder, did not use its voting position to assure that its purpose in initiating the merger proposal was accomplished.

The facts of the matter clearly indicate that Signal was motivated by its own economic interests, and thus those of its own

shareholders, in determining to acquire the remaining 49.5 per cent interest in UOP. It had surplus cash as a result of the sale of its Signal Oil and Gas Company subsidiary in 1974. It had been looking for other places to invest this excess cash. It had attempted two other acquisitions or combinations during 1977, but the effort had been unsuccessful. By its own admission, in the early part of 1978 the acquisition of the balance of UOP's minority shares so as to give Signal 100 per cent ownership of UOP appeared to be the best investment opportunity then available to it.

There were also other benefits which would accrue to Signal, as well as to UOP, in the event that UOP became Signal's wholly-owned subsidiary. The problem of Signal having to account for all of UOP's debts and sales, but only 50.5 per cent of its earnings, would be eliminated. The exchange of information and business opportunities between UOP and Signal's other subsidiaries would be freed of any potential conflict of interest problems. Significant tax, accounting and insurance savings would be realized, and the cost of duplicative reporting to regulatory agencies would no longer be present.

Plaintiff argues that none of these latter considerations can be relied upon by Signal as justification for acquiring the remainder of UOP's shares at the expense of eliminating the minority shareholders. He says that to the extent that they posed problems and expense to Signal, they were readily foreseeable to Signal in 1975 when it determined to acquire only a 50.5 per cent interest. They represent matters which befall all majority shareholders. Thus, plaintiff argues, Signal cannot bootstrap its position by knowingly and deliberately creating problems and expense because of the nature of its original acquisition, and then rely on the removal of these objectionable features as a basis for claiming that it had a valid business purpose for merging out the minority thereafter.

Moreover, plaintiff points out that in *Tanzer* it was found that the majority shareholder had a "present and compelling" need to become sole owner of the corporate enterprise and therefore to eliminate the minority. He says that there was no present business compulsion for UOP to become the sole owner of UOP here. It faced no dire consequences if it failed to do so. Rather, it made its decision because at the time the acquisition of the balance of UOP looked to be the best investment opportunity available to it. Its decision was completely voluntary and in furtherance of its own interests. Thus, plaintiff argues that under *Tanzer* Signal's purpose cannot be held a proper one.

I find this argument unacceptable. Logically extended, it means that if one company desires to obtain control of another through the tender offer device, it must get all of the outstanding shares through the offer, or forever hold its peace thereafter as to any consequences resulting from an acquisition of less than all outstanding shares. With a large, publicly-held company, such logic is unrealistic.

In addition, plaintiff's argument that a decision to acquire full ownership of a subsidiary can never be proper where it is uncoerced by economic conditions, and where it is motivated solely by the business interests of the majority shareholder, does not appear to be in accord with the case law. As stated in *Sterling* at 93 A.2d 112–113:

> "[Mayflower's] directors and stockholders have determined, not that the [Mayflower] venture should be terminated, but that it should be integrated completely with the Hilton enterprise. Having made this decision they had the right to avail themselves of the means which the law provides *for just such a purpose*, subject always to their imperative duty to accord to the minority fair and equitable terms of conversion." (Emphasis added.)

Mayflower's directors were all nominated by Hilton and its stockholders were dominated by Hilton's 80 per cent ownership. The purpose referred to was necessarily

that of Hilton. See also the finding of the Chancellor in his decision *Sterling* at 89 A.2d 867:

"From the time that Hilton first acquired the majority stock interest it intended to acquire the Mayflower Hotel property and to integrate it with Hilton's other assets."

Thus, the purpose in *Sterling* was to further the investment and business interests of the majority shareholder. There it was a vol-untary rather than an economically compelled decision on the part of a majority shareholder. *Sterling* is still the law.

Moreover, *Tanzer* does not purport to change this aspect of *Sterling*. Rather it says that the valid business interests of the majority shareholder can constitute a proper purpose for the merger provided that they are *bona fide* and not merely a "trumped up" subterfuge to get rid of the minority.

■ On the evidence, I do not find Signal's decision to be a mere subterfuge to get rid of the minority shareholders, even though, just as in *Sterling*, their elimination from further participation in the subsidiary corporation was an inescapable result. Signal itself is an investment company. Its primary reason for seeking the remainder of UOP's shares was its conclusion that UOP, as a wholly-owned Signal subsidiary, represented at the time the best possible placement for a portion of Signal's surplus cash. Its unsuccessful efforts between 1975 and 1978 to find other sources for the diversification of Signal's holdings lends support for this finding.

In fact, plaintiff's argument on this point is based on his very acceptance of Signal's position that it took the action to acquire all remaining shares of UOP in the economic interests of itself and its shareholders. The fallacy of his argument, as I see it, is its *assumption that such action taken in the interests of a majority shareholder, the effect of which is to eliminate the minority shareholders, is always wrong* unless it can be shown, as was the situation in *Tanzer*, that there is some compelling, nonvoluntary

business reason which motivates the action. I do not read *Tanzer* as standing for the proposition that such a compelling and non-voluntary reason must be present in every case in order for the purpose to be found a proper one. *Sterling*, which *Tanzer* approves, supports this interpretation.

Accordingly, I find that there was a proper purpose for the merger, and that it was not designed as a mere subterfuge to get rid of the minority shareholders.

Accordingly, as required by *Tanzer*, I next turn to an evaluation of the other challenged elements of the transaction, applying the entire fairness test of *Sterling* to the issues framed by the plaintiff's allegations and the evidence offered in support of and in opposition thereto.

### THE ALLEGED MISREPRESENTATIONS TO UOP'S SHAREHOLDERS

As noted previously, plaintiff is charging that Signal misused its majority position by permitting and/or assisting the management and board of UOP to disseminate less than candid proxy information to UOP's minority shareholders and by issuing misleading press releases concerning the merger prior to the vote at UOP's annual meeting. These charges break down into three categories. The first deals with the so-called "negotiations" between UOP and Signal as to the terms of the merger. The second deals with the proxy representations concerning the Lehman Brothers fairness opinion. The third concerns the representation that the vote of UOP's board to approve the merger was unanimous. I discuss these contentions as a group.

Plaintiff argues that in truth there never were any negotiations between UOP and Signal as to what would be a proper price to be paid to the minority for their shares. He says that the evidence clearly reveals that Signal's management selected a price range of $20 to $21 per share, that this price range was immediately agreed to by Crawford in

his capacity as president of UOP, and that in reliance on the supposition that Crawford had considered the interests of UOP's minority in his dealings with Signal the price of $21 was approved by UOP's non-Signal directors without question and without any effort to obtain a higher amount.

Plaintiff points to Crawford's admission that he never attempted to get anything more than the top figure of $21 offered by Signal. He points further to the fact that there is no evidence of anyone at UOP attempting to bargain for a price higher than $21. He contends that the evidence reveals that there was no bargaining whatsoever on behalf of UOP's minority. Yet he says that UOP's management clearly knew how to bargain since it had done so during the 1975 tender offer negotiations when UOP's representatives caused Signal to increase its original proposal from $19 to $21 per share. He also says that Crawford well knew how to bargain when it suited his purpose since he managed to get Glanville to reduce the price for the Lehman Brothers fairness opinion from $250,000 to $150,000.

In view of this, plaintiff says that it was misleading for Signal to issue press releases on February 28, 1978 and March 2, 1978 indicating that negotiations were ongoing between Signal and UOP for Signal's contemplated acquisition of UOP's minority shares. He says that this wrong was compounded by UOP's March 7, 1978 letter to its minority shareholders advising them of the approval of the terms of the merger by UOP's board in which reference was made to the prior announcements by Signal and UOP that "negotiations were being conducted." He says that the absence of negotiations is established by UOP's decision to change the word "negotiations" to "discussions" in the Proxy Statement when confronted by the request of the Securities and Exchange Commission for the details of the negotiations.

As to the Lehman Brothers fairness opinion, plaintiff says that the Proxy Statement disclosures were designed to lead the minority shareholders into believing that a repu-table investment banking firm had investigated the worth of their shares and found $21 to be a fair price, when in reality the Lehman Brothers team had done nothing more than make a cursory, two-day review of publicly available statistical data and conduct a one-day "due diligence" visit at UOP's headquarters during which they accepted the representations made by UOP's management personnel without serious question. Plaintiff charges that the Lehman Brothers opinion was nothing more than a superficial substantiation of Glanville's initial, personal opinion that a $20 to $21 price range was fair, and thus was merely a rubberstamp approval of that which Signal had decided to offer. He says that it was a misrepresentation for UOP not to disclose the true manner in which the opinion was given and to thereby generate the false impression that Lehman Brothers had impartially looked to the interests of the minority shareholders.

Finally, plaintiff charges that it was misleading for the Proxy Statement to indicate that the terms of the merger had been approved unanimously by UOP's board when actually the Signal-affiliated directors had abstained from voting on the advice of counsel. He also wonders why Crawford, who was also a director of Signal, voted as a member of UOP's board when all other UOP directors who were also Signal directors felt that legal need to abstain.

Relying on the requirement of "complete candor" set forth in *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1977), plaintiff argues that it was improper for UOP and Signal to thus lead the minority into believing that the merger price had been negotiated as a result of give-and-take bargaining between the managements of Signal and UOP, or that the negotiated price had been evaluated in depth and pronounced fair by a reputable investment banking firm, or that the price had been approved by the unanimous vote of UOP's board. He contends that this failure on the part of the defendants to make a complete disclosure of all germane facts prevented an

informed vote by the minority shareholders, and thus prohibits the defendants now from relying on the fact that the terms of the merger were overwhelmingly ratified by those minority shareholders who chose to vote.

I do not find these arguments persuasive. Plaintiff has his concept of what is meant by the term "negotiations." However, his interpretation is not the only one, nor is it necessarily the correct one.

As defined in *Webster's Third New International Dictionary*, "negotiate" means

> "to communicate or confer with another so as to arrive at a settlement of some matter; meet with another so as to arrive through discussion at some kind of agreement or compromise about something: come to terms esp. in state matters by meetings and discussions."

*Black's Law Dictionary* (4th Ed.) defines "negotiation" as follows:

> "The deliberation, discussion or conference upon the terms of a proposed agreement; the act of settling or arranging the terms and conditions of a bargain, sale, or other business transaction."

Here there were matters that went into the makeup of the merger agreement other than price. As Crawford indicated at the initial meeting on February 28, 1978, there were employee stock options and incentive programs at UOP to be considered. Some assurance as to the future employment prospects of key UOP personnel was also a concern. In addition, as Signal points out, plaintiff conveniently overlooks the fact that UOP's 49.5 per cent minority was comprised of 5,688,302 outstanding shares. Thus the price range initially proposed by Signal of $20 to $21 per share involved a potential swing in the acquisition price of $5,688,302 depending upon whether an agreement was finally reached on the high figure, the low figure or something in between.

The proposal was made first to Crawford with the understanding that he would submit it to his directors for their reaction. He did so, he discussed it with them on an individual basis, and he then advised Walk-

up that he thought UOP'c board would be receptive provided that the $21 figure was used.

In short, between February 28 and March 6 there were discussions and deliberations by both sides, and, to a limited degree, with each other concerning the terms of the merger agreement which was to be submitted to the boards of Signal and UOP on March 6 for their respective considerations. Plaintiff's view is that there can be no negotiation as to price unless one side first demands an amount in excess of the price range initially suggested by the other. But that is not necessarily required by the accepted definition of the term.

Accordingly, I do not find that the press releases of February 28 and March 2 contained material misrepresentations to the extent that they indicated that negotiations were being conducted between the two corporations. Nor do I find any misrepresentation in this regard in the Proxy Statement.

As to the Proxy Statement reference to the Lehman Brothers fairness opinion, it is significant that a copy of the opinion letter was attached as an exhibit to the Proxy Statement, and that the letter contained the following statement:

> "In the process of forming our opinion expressed herein, we did not make or obtain independent reports on or appraisals of any properties or assets of UOP and have relied upon the accuracy (which we have not independently verified) of the audited financial statements and other information furnished to us, or otherwise made available, by UOP."

I agree with the defendants that this distinguishes the matter from *Denison Mines Ltd. v. Fibreboard Corp.*, 388 F.Supp. 812 (D.Del.1974). In that case it was held that a proxy material reference to a fairness opinion by Lehman Brothers was misleading because the opinion letter had indicated that in reaching its decision Lehman Brothers had made no independent evaluation of certain assets, but that this factor had not been disclosed to the shareholders. In *Den-*

*ison*, however, the opinion letter itself was neither specifically referred to nor reproduced in the proxy materials. That was not the situation here.

Plaintiff also argues that Lehman Brothers was not truly "independent" at the time that it gave its opinion and that defendants violated their duty of full disclosure by not revealing this fact. But there is no convincing evidence that Lehman Brothers had any commitment to Signal that would have had any bearing on its opinion. It had served as UOP's investment banker for almost 20 years and therefore had a degree of familiarity with UOP's business and prospects. There is no evidence of any communications between Signal and Lehman Brothers concerning the merger. As to LB–40, the mysterious document mentioned earlier, the evidence shows that no one at either Signal or UOP was aware of its existence until after the suit was filed. Obviously, there could have been no obligation upon UOP at the time to disclose it as a part of the proxy materials, or to comment on its possible effect as to the independence of Lehman Brothers in giving its opinion.

Finally, however it came about, UOP hired Lehman Brothers to render an opinion, and the opinion given was offered as being that of Lehman Brothers. I cannot see where UOP had any obligation to state or insinuate in any way in the proxy materials that the opinion was really the personal opinion of Glanville based upon his initial reaction that the $20 to $21 price range was fair because it represented almost a 50 per cent premium over market. The evidence shows that other qualified persons at Lehman Brothers worked on the project and that a good deal of information was reviewed before the opinion letter was issued. In this context, I find no misrepresentations or lack of disclosure in the Proxy Statement reference to Lehman Brothers.

Finally, although it may be a technical point, I find no material misrepresentation in the fact that the vote of UOP's board to approve the terms of the merger was said to be unanimous. While it is true that not all of UOP's directors voted in favor of the merger due to the fact that five Signal-affiliated directors abstained, it is also true that none of UOP's directors voted against it or offered any opposition to the fairness of the proposal.

■ Under the standards of *Lynch v. Vickers Energy Corp., supra; TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and *Kaplan v. Goldsamt*, Del.Ch., 380 A.2d 556 (1977), I find no material misrepresentation or failure to disclose germane information by UOP in the Proxy Statement or by Signal in the press releases, and to this end I find no misuse of the corporate machinery attributable to Signal as majority shareholder, either direct or indirect, which would require that the vote of the majority of the minority shareholders be discounted in evaluating the fairness of the terms of the merger to UOP's minority shareholders.

## THE ALLEGED FAILURE OF UOP'S BOARD TO FULFILL ITS RESPONSIBILITY TO ITS MINORITY SHAREHOLDERS

Plaintiff makes many assertions which could be categorized under this aspect of his case. I find the most significant of these contentions to be three in number. First, plaintiff again charges that UOP's board failed to negotiate the merger price offered by Signal, again because it made no attempt to obtain any amount over the high figure of $21 originally proposed by Signal. Secondly, plaintiff says that UOP's board failed to properly weigh and consider Signal's proposal. As to this, he points to the hurried manner in which the board met and approved the merger without first seeking a current appraisal or evaluation of the minority interests. Thirdly, and in relation to this second contention, he claims that UOP's board failed to take into consideration the worth of substantial real estate and patent assets of UOP which were carried on the corporate books at a grossly undervalued figure, that it failed to insist on some provision that would have given the minority the benefit of an overall rise in the general value of stock market securities

between March 6, 1978 and May 26, 1978, and that it failed to protect the minority against being deprived of a second quarter UOP dividend, the value of which, in effect, went to Signal as of the time the merger was approved.

The argument that UOP's board failed to negotiate with Signal on behalf of the minority interests again comes down to plaintiff's basic premise that one in a fiduciary capacity must always attempt to get more than is offered in order to discharge his fiduciary duty. This is not necessarily true in all cases.

As Signal points out, its position with regard to the merger was completely different than its position in 1975 when it set out to acquire an interest in UOP. In the latter situation, it was in a position to bargain for the best possible deal from its point of view. In attempting to arrive at a price for the tender offer which would not be opposed by UOP, in addition to bargaining on a price for the direct purchase of a large number of shares from UOP, it was in a position to start as low as reasonably possible and, through the give and take process, arrive at the best price possible from the standpoint of its own interests.

In 1978, however, as majority shareholder of UOP, it had no similar bargaining position. As Signal readily concedes, it wore two hats with regard to the acquisition of UOP's minority interests. As majority shareholder, it owed a fiduciary duty of fairness to UOP's minority. It could not start at a price below that which it truly felt to be the fair value of UOP's shares and bargain upward. At the same time, Signal's board owed a fiduciary duty to its own shareholders in dealing with Signal's assets. Thus, it had to take care that it did not propose to pay more than was fair and reasonable for the UOP shares.

Viewed in this context, Signal's proposal of a price range of $20 to $21 on February 28 was not necessarily one that called for a counteroffer. What it called for was consideration by UOP's board as to the fairness of the price proposed. Thus, if UOP's board, after reviewing the matter, was convinced that the high end of the proposed price range was fair and reasonable to the minority, then its failure to seek still a higher price did not, of itself, constitute a breach of its fiduciary duty owed to its minority shareholders. Thus, the true focus must be on the reasonableness of the action taken by UOP's board in considering the proposal, and not on its failure to seek a higher price than that suggested.

■ On this point, plaintiff makes perhaps his strongest showing. UOP's board did act on three business days' notice. It did not seek an independent appraisal of the current value of UOP's shares before acting, and the expedited scheduling of its meeting on March 6 was obviously within the control of Signal. Moreover, I am satisfied that the primary factor considered by those concerned was the comparison of Signal's 1978 proposal with the situation prevailing at the time of the 1975 tender offer.

Immediately prior to the 1975 tender offer and stock purchase, UOP stock had been trading for a fraction under $14 per share. At the price of $21 per share, the tender offer had been greatly oversubscribed. In early 1978 UOP was in substantially the same financial condition as it had been at the end of 1974 and was showing comparable earnings. On February 28 the closing market price of its stock was $14.50 per share. I think it is fairly clear that these factors, taken in conjunction with the financial information available and made available to the independent members of UOP's board as well as the fairness opinion supplied by Lehman Brothers, caused the general feeling to be that if $21 per share was an unnecessarily high price to have paid in 1975, it was a fair price to pay for the minority shares in 1978 under comparable circumstances.

But I note also that the non-signal members of UOP's board were substantial businessmen in their own right, some of whom had served on UOP's board for a considerable number of years and who were therefore familiar with UOP's present condition, past performance and future prospects. They included a former president and chief

operating officer and a former chairman of the board of UOP, each of whom owned more than 7,000 shares of UOP and who therefore had more than passing reason to be interested in the adequacy of the price proposed by Signal. While there are different ways to approach the same problem, and while plaintiff would urge that a different approach than that taken by UOP's board should have been required, I cannot find on the evidence that UOP's board failed to properly weigh and consider the transaction with regard to the interests of the minority shareholders. It does not appear that they were operating in a vacuum.

Turning to the alleged failure of UOP's board to give consideration to undervalued assets of UOP, plaintiff points out that the Lehman Brothers fairness opinion, on which UOP's board relied in part, expressly accepted UOP's figures without any investigation or appraisal as to the true value of assets as compared with the value carried on UOP's books. In this regard, plaintiff asserts that UOP has some 270,000 acres of timberland which is carried on its books at an acquisition price averaging some $38 per acre. He also says UOP has valuable patent and royalty interests which were not carried on its books at a true present value. Since Signal was acquiring these assets as a result of obtaining 100 per cent ownership of UOP, plaintiff says that it was improper for UOP's board not to have had a current appraisal made of these assets and to have failed to consider such updated values in passing on the fairness of the merger price to the minority.

This argument is answered by *Sterling v. Mayflower Hotel Corp., supra.* In that case, the value of the assets being acquired by Hilton was the prime concern of the plaintiffs. The report on which Mayflower's board had relied contained no finding or comparison of Mayflower's net asset value. In its decision, the Supreme Court held that the element of net asset value was a proper one for consideration. However, in the proceedings in this Court, both sides had been permitted to offer affidavits pertaining to the net asset values of Mayflower and Hilton. Based upon that submission, both this Court and the Supreme Court considered net asset value as a part of the overall picture and found that it was of little significance under the circumstances.

The effect of this finding is that the failure of Mayflower's board to consider net asset value in agreeing to the merger terms did not constitute a breach of the fiduciary duty owed to Mayflower's minority where a subsequent review of that element by the courts indicated that it would have made no difference. As stated by the Supreme Court at 93 A.2d 116:

"In these circumstances we deem the evidence adduced by the defendants upon the issue of comparative net asset value to be sufficient to discharge whatever duty they were under in respect of the matter; and this notwithstanding the inconclusive nature of the 'indicated values' arrived at [in the report]."

Later, at the same page reference, and in response to the plaintiff's charge that Mayflower's directors "did not give proper consideration to the question of the value of Mayflower's assets in their approval of the terms of the merger" the Supreme Court stated as follows:

"Since the deficiency in the Haslam report in this respect is supplied by other evidence the effect of which is to corroborate the findings of the Haslam report, we think this omission (if it was an omission) of little significance."

Thus, the failure of UOP's board to obtain and consider the updated value of UOP's timberland and patent and royalty assets does not constitute a breach of its fiduciary duty to the minority if the evidence presented on behalf of the defendants at trial reveals that the value of such assets had no material bearing on the fairness of the terms of the merger. For the reasons set forth hereafter, I find such to be the case, and thus I find no impropriety chargeable to UOP's board in this respect.

As to the two remaining contentions under this category, I think it obvious that a general, overall rise in stock market prices (said to have been 13 per cent between

March 6, 1978 and May 26, 1978) does not mean that the value of the shares of all corporations went up during that period. It is true that the approval of the $21 merger price by the boards of UOP and Signal on March 6 put a "cap" on the value of the UOP shares. But whether they would have otherwise increased or decreased during the two and one-half month period thereafter is a matter of speculation. At least there is no evidence that they would have increased in value at the rate of the overall market rise, and therefore I find no breach of duty on the part of UOP's board in failing to attempt to secure the inclusion of such a provision in the merger agreement.

As to the fact that the merger agreement made no provision for UOP's minority to receive an aliquot share of any second quarter dividend, the defendants have advanced no real argument or explanation. I can only assume that in view of the price being offered and the right being given to the minority to reject the entire proposal, it was not considered by either board to be a necessary term or item for inclusion in the merger agreement. In any event, in view of the subsequent vote of approval by the minority shareholders, I do not view it to be an element of such significance, when considered with all other factors, as to brand the merger unfair.

Accordingly, on these and the other matters on which issue was joined, I find no dereliction on the part of UOP's board which would amount to a breach of its fiduciary duty to UOP's minority shareholders.

## THE ALLEGED INADEQUACY OF THE MERGER PRICE

The foregoing contentions having been disposed of, we now come to the final aspect of plaintiff's case, namely, that even if there was no improper purpose for the merger, and even if there was no misuse of its majority position by Signal in bringing about the merger on terms which it knew to be unfair to the minority, and even if there was no breach of fiduciary duty on the part of UOP's board in the manner in which it accepted the merger terms and recommended approval by the minority shareholders, nevertheless the price of $21 per share paid to the minority was still inadequate and indefensible on the facts, thus requiring actiof by the Court so as to remedy the injustice of the situation.

In support of this argument plaintiff offered the expert testimony of Kenneth Bodenstein, a chartered investment analyst with the firm of Duff & Phelps. Bodenstein offered two basic approaches in support of his ultimate opinion that the value of UOP's shares to its minority shareholders as of the date of the approval of the merger agreement was not less than $26 per share. One approach was that of a comparative analysis; the other applied the discounted cash flow method.

While I make no effort to discuss in any detail the workings of either method, I think it significant to note that both were based on the value that one would supposedly derive as a result of becoming a 100 per cent owner of an ongoing corporation as opposed to acquiring a less than 100 per cent interest. The underlying rationale is that one with full and complete ownership of a company is free to take out of it whatever he wants, to direct the business as he sees fit, to declare dividends as needed, etc., thus making his ownership interests a thing of greater value than an ownership interest shared with others whose rights and financial position must also be honored.

Against this background, Bodenstein conducted a comparison of the premium over market being paid within a related time frame for mergers or tender offer-merger combinations which resulted in 100 per cent ownership to the acquiror and in which the cost of acquisition was $100 million or more. This was to use transactions comparable to Signal's acquisition of the remaining minority interest of UOP.

Bodenstein selected ten such comparable transactions. As to each he found what he termed a prior market price. In some, this was the market price on the day preceding the first announcement of the transaction. As to others he examined price and volume

figures for a period of time prior to the announcement so as, where appropriate, to factor out any distortion in the otherwise prevailing market price that might have been caused by leaks, market premonition of an impending acquisition, etc.—"noise" as described by Bodenstein.

From the merger or acquisition price paid, Bodenstein deducted the prior market price as found by him, and then divided that market price into the difference. This gave him the percentage of premium per share over market paid in each transaction by the acquiring company in order to obtain 100 per cent control. He then found the median rather than the average of these ten transactions so as to rule out any distortion that might have been involved in averaging. The median premium thus found by him for these comparable transactions was 74 per cent.

Bodenstein thus concluded that a reasonable premium for Signal to have paid so as to become 100 per cent owner of UOP would have been between 70 per cent and 80 per cent. Applying this to UOP's high of 14¾ on February 28, 1978, the last trading day before the announcement of the merger negotiations (he said that using the closing price of $14.50 would have made no difference), a price at which he found the market to be valuing UOP fairly, Bodenstein concluded under this comparative analysis that the fair value of the shares of UOP was between $25.65 and $27.30.

The discounted cash flow method of analysis, as explained and utilized by Bodenstein, looks to the cash generating capability of a company as a going concern. It is based upon the amount of cash that can be taken from a company by its owner at a given time without adversely affecting its financial and business condition. Thus, it looks to things different than net earnings, dividends, price earnings ratio, etc. for its ultimate conclusion.

The discounted cash flow approach also treats various expense items as cash. For example, depreciation is an allowable expense under accounting principles, and is therefore an allowable deduction. But it represents a non-cash outlay, and therefore it produces cash to the company in the sense that it is a deductible loss that does not have to be paid. The same can be said of deferred income taxes and certain other items. Under Bodenstein's approach, the value of these items of deductible expense must be added to actual income to indicate the true cash flow from operations. Deducting from this cash flow an amount to reasonably cover capital outlay and long-term debt requirements results in a figure representing "net free cash from operations." This figure is then capitalized at an appropriate interest rate so as to determine the present value of the net free cash.

To this is added the value of any excess liquidity or extraordinary items. The term "excess liquidity" as defined by Bodenstein is "the working capital that is not required to generate the earnings of the business from its operations." The sum of the three, that is, the present value of net free cash, the excess liquidity and the extraordinary items, is then divided by the number of shares so as to determine the per share value. For purposes of illustration, Bodenstein's discounted cash flow analysis of UOP for 1977, based upon the actual financial figures for UOP, is set forth in the margin.*

---

\*              "UOP CASH FLOW – 1977

| Sources | In Millions |
|---|---|
| Income before extraordinary items | $ 24.3 |
| Depreciation | 15.0 |
| Deferred income taxes | 2.3 |
|      Cash flow from operations | $ 41.6 |

Bodenstein's figure of $37 million in excess liquidity was based on his finding that UOP had been able to reduce its short term debt from a figure of some $50 million in 1974 to a point where it was almost nonexistent by the end of 1977, and that it had a consistent investment record in short term market securities in addition to a large amount of cash on hand and unused bank credits. In his view, there was between $50 million and $60 million that could have been taken out of UOP without affecting its income producing ability as of the time of the merger. For reasons which he explained, he used the figure of $37 million so as to be on the conservative side. He also placed a liquidity value on the timberlands on the theory that they too represented something that could be removed from the corporation without affecting its otherwise normal income flow.

In addition to the foregoing analysis for 1977, by virtue of which he found the value per share to be either $28.09 or $25.21 depending on the discount rate applied, Bodenstein also performed a cash flow analysis for UOP for 1978. This was based on a combination of actual figures for a period prior to the date of the annual shareholders meeting coupled with the Proxy Statement projections of UOP's management for the balance of 1978. In so doing he applied a higher 10 per cent discount factor so as to reflect the risk of the possibility as of the time of the merger vote that something adverse could have happened to UOP during the balance of 1978. Under this 1978 analysis, he found that the value of the minority shares would have been $27.16.

Finally, Bodenstein made a similar discounted cash flow analysis under UOP's five-year business plan for the years 1978 to 1982. Under this he concluded, alternatively, that the value of UOP's minority interest was either $25.94 or $30.59 per share.

From all of his findings under both the comparative analysis and the discounted cash flow approach Bodenstein reached his conclusion that the value of the UOP minority shares acquired by Signal was not less than $26 per share.

With all deference to his obvious ability, I have several problems with the Bodenstein approach. To begin with, the evidence indicates that there were reasons for UOP's cash status. Some $37 million of the cash accumulation reflected payments advanced on contracts by its customers and thus was not money that could be removed from the company. Also a great deal of it had been advanced to UOP's foreign units and thus was subject to exchange control restrictions of foreign governments. It was not necessarily free for removal at will by a 100 per cent owner as Bodenstein's analysis presupposed.

In addition, as defendants point out, the discounted cash flow analysis has at its core the fortuitous selection of a discount factor which is not necessarily related to any objective standard. This is illustrated by the discount factors utilized by Bodenstein in his 1977 analysis: one being the "high side"

\*                    "UOP CASH FLOW - 1977

| Uses | | In Millions | |
|---|---|---|---|
| Additions for plant and equipment | | 16.3 | |
| Long-term debt payment (net) | | 4.5 | |
| Cash requirements | | $ 20.8 | |
| Net free cash from operations | | $ 20.8 | |
| | | 7.5%[1] | 8.5%[2] |
| Present value of net free cash | | $277.3 | $244.6 |
| Excess liquidity | | 37.0 | 37.0 |
| Extraordinary items | | 7.0 | 7.0 |
| | | $321.3 | $288.6 |
| Per share basis | | $28.09 | $25.21 |

[1] High side of discount range found in sample of 1977/1978 acquisitions

[2] Average Moody's Industrial Bond yield average: February, 1978"

of the "discount range" found in a sample of 1977–1978 selected acquisitions; the other being Moody's Industrial Bond yield average for the month of February 1978. Presumably, other analysts might choose to use any number of other points of reference in trying to calculate an appropriate return on investments to be applied as a discount factor.

As defendants also point out, an adjustment in the discount rate to be applied can dramatically change the end result. For example, for the first two months of 1978 UOP's stock had averaged trading for just under $15 per share. For the year 1977, its earnings from continuing operations had been $2.12 per share. This equates to a price/earnings ratio of approximately 7:1, which thus represents a return of about 14 per cent. In other words, it could be argued that immediately prior to the merger announcement the market was willing to pay about $15 for a share in UOP in order to get a 14 per cent return of $2.12 per share. If one selects this as a basis for using a discount rate of 14 per cent, and uses all other figures contained in Bodenstein's 1977 cash flow analysis, the value per share becomes $16.81.

Correspondingly, and again for purposes of illustration, in his 1978 analysis Bodenstein assumed a need of $17.5 million for UOP to maintain its plant and equipment in order to generate a cash flow equivalent to that found for 1978. However, a historical averaging for the prior five-year period indicates annual capital expenditures of $23.9 million for UOP. If this latter figure were used in the 1978 analysis, the net free cash flow would have been reduced by $6.4 million and, even applying Bodenstein's 10 per cent discount factor, the per share value would be reduced to $16.16. If a 14 per cent factor were used, the per share value would be even further reduced to $11.54.

In short, this opportunity for the subjective selection of factors, a small variation in which can cause a wide divergence in the end result, renders Bodenstein's discounted cash flow approach unnerving when one sets out to rely upon it in an attempt to ascertain whether or not the amount paid for minority interests in a cash out merger is fair and reasonable.

Thirdly, I have difficulty with the entire concept employed by plaintiff's expert. As noted previously, it is viewed from the standpoint of the value of a share of UOP to Signal, (or to any majority shareholder in a similar situation) because of the fact that the acquisition is transforming it into the 100 per cent owner of its subsidiary. Thus, as I perceive it, plaintiff seems to be arguing that in order for the transaction to be fair to UOP's minority shareholders, they must be paid the value of the stock to Signal. And this would appear to be in contrast to the value of a share of UOP in the hands of all shareholders as of the time of the merger.

This position of the plaintiff, if I have perceived it correctly, stems from the admonishment in *Singer, Tanzer* and *Roland International*, that a majority shareholder cannot be absolved from the scrutiny of the courts simply because minority shareholders who are unhappy with the cash out price have the right to seek judicial determination of the value of their shares under the appraisal statute found at 8 *Del.C.* § 262. As a consequence, plaintiff seems to be contending that the factors which go into a determination of the value of stock under a § 262 appraisal proceeding are not those which apply in a proceeding such as this wherein a minority shareholder is attacking the fairness, and thus the validity of the merger itself, on the grounds that the price paid for the minority interests is grossly inadequate. Thus, plaintiff seems to be suggesting that in evaluating the fairness of the merger terms to the minority in such a proceeding as this, one must look to what it is reasonably worth to the former majority shareholder to be rid of all other shareholders so as to become the sole owner of the enterprise, and then, using that as a basis or starting point, determine what is a fair amount for it to have paid the minority for the right to become sole shareholder. The resulting figure the plaintiff, through the approach employed by his expert, would

transform into the fair value of the minority shares in the context of a cash out merger.

I do not find this approach to correspond with either logic or the existing law. In the first place, it assumes that a stock has more than one value in the hands of a minority shareholder. That is to say, if he has no complaints as to how the merger came about and no complaints as to the good faith effort of those in a fiduciary position to discharge their duties, but if he nonetheless has an honest difference of opinion as to the price and for that reason desires an appraisal under § 262, then the Court hears evidence and values his shares under one standard. But if the same shareholder feels that those in a fiduciary position to his interests have acted in disregard of their duty, or if he feels that a concentration of all the corporate stock in the hands of the former majority shareholder will unjustly enrich the former majority shareholder when compared against that which he is paying for it, then the Court is to hear evidence and value his shares under a different standard. I cannot believe that the policy of our law contemplates the application of such a dual standard.

Aside from this, the case law does not support the distinction that plaintiff is attempting to make. Again, as directed by *Singer, Tanzer* and *Roland International*, I return to *Sterling v. Mayflower Hotel Corp., supra*, for the final analysis. There it was stated by the Supreme Court that upon the conversion of the Mayflower stock into Hilton stock a minority shareholder of Mayflower was entitled to receive "the substantial equivalent in value of the shares he held before the merger." 93 A.2d 110. That was the test. A Mayflower shareholder was not entitled to "something that he did not have before the merger and could not obtain"—in that case the liquidating value of his stock. 93 A.2d 111.

Further, at 93 A.2d 114, after making its statement that in order to arrive at a judgment of the fairness of a merger all of its terms must be considered, the Supreme Court observed as follows:

"A similar rule obtains in ascertaining the value of stock in appraisal proceedings under the merger statute. In such cases the liquidating value of the stock is not the sole test of value; all relevant factors must be considered."

I take this to mean that the approach to valuing shares under the *Sterling* rationale is no different than that to be employed in appraisal proceedings. If there is a difference in the function of the Court in the two situations, perhaps it lies in the fact that its ultimate purpose is different.

It has been held that under the appraisal statute it is necessary to "arrive at a dollar and cents' appraisal." *Jacques Coe & Co. v. Minneapolis-Moline Co.*, Del.Ch., 75 A.2d 244, 246 (1950). Such a precise finding of value is apparently not required in such a proceeding as this where, at least in legal concept, the ability of the merger to stand as a valid legal act is being challenged. At least in *Sterling* there was no precise finding by the Courts as to the value of either the Hilton or Mayflower shares. In both this Court and in the Supreme Court it was simply found that based upon the objections put forth by the plaintiffs, no fraud or unfairness had been shown. Under *Singer, Tanzer* and *Roland International, Sterling*, is still the law.

Thus, to the extent that plaintiff is suggesting that in the context of a cash out merger the fairness of the price paid to the minority is to be determined by reference to that which the former majority shareholder will have immediately after the merger as a result of being the 100 per cent owner of the corporation, I reject the argument as being unsound and not in accord with the existing law.

At the same time, it is presumably proper to view the benefits that may flow to the majority shareholder as a result of becoming the 100 per cent owner as one of the elements to be considered in determining the fairness of the transaction. I say this again because of the decision in *Sterling*.

There, it will be remembered, the decision of the respective corporate boards that the

conversion rate should be one share of Hilton for one share of Mayflower was based upon an independent report obtained by Hilton. That report concluded, based upon a comparison of the two companies over the preceding five years among other things, that the financial record of Hilton had been substantially superior to that of Mayflower and that on a purely statistical basis it could be argued that Hilton should have offered no more than ¾ of a Hilton share in exchange for each Mayflower share. However, the report further concluded that (1) because of problems that had been incident to Hilton's controlling interest in Mayflower and (2) because of the advantages that would accrue to Hilton as an incident to 100 per cent ownership, "a share-for-share exchange will be fair and reasonable to all concerned." 93 A.2d 110. By ultimately affirming the Chancellor and thus finding the terms of the merger to be fair to the minority, it can be argued that the Supreme Court tacitly recognized that as a part of "entire fairness" it was proper to allow the minority some element of value over and above the otherwise provable value of the minority shares for the benefit that would come to the majority shareholder as a result of becoming the 100 per cent of the subsidiary through the merger process. This is not to say that it is an absolute requirement, however, and it does not mean that the value of the minority shares to the majority shareholder is the standard to be applied.

Having discussed the evidence as to the adequacy of the merger price offered by the plaintiff, I turn to that submitted by the defendants. For the purposes of trial, the defendants retained the investment banking firm of Dillon, Read & Co., Inc. to review the financial terms and conditions relating to the merger and to give an opinion as to whether they were fair and equitable to the holders of common stock of UOP other than Signal. I note that in so doing

Dillon, Read was being asked to give, and that it did give, an opinion on one of the ultimate issues before the Court. This is now permissible under the Rule 705 of the Delaware Uniform Rules of Evidence, and even though these Rules did not officially become effective until several weeks following the trial, they had been promulgated prior to the trial and their impending effective date was known to all at the time of the trial. For this reason, and because of its established reliability, the evidence was admitted in the form offered.**

The Dillon, Read report, as presented at trial by William K. Purcell, its Senior Vice President, approached the task in the manner generally approved by the Delaware case decisions dealing with appraisal actions under 8 *Del.C.* § 262. It considered market value, net asset value and investment value, including UOP's dividend record. It examined these elements for the five-year period prior to and including the merger and compared them against the performance of certain companies selected as being reasonably comparable to UOP in their business activities. Dillon, Read also considered the structure of the merger, i. e., the vote being left to a majority of the minority shareholders with its added requirement that a sufficient number of minority shareholders vote in favor of the merger so that, when coupled with Signal's 50.5 per cent vote, at least two-thirds of all outstanding shares gave their approval to the transaction. Dillon, Read also considered the so-called premium paid by Signal over the market price existing on the day preceding the announcement of the merger.

Without attempting to go through the entire methodology employed by Dillon, Read, I take note that the high market price for UOP shares during the five calendar years 1974–1978 was $18.75 in 1974, that the average high trading price by averaging each of the five years was $17.05, the

** Dillon, Read was also asked to give its opinion on whether the information set forth in the Proxy Statement contained untrue statements or omitted material facts which would have rendered the Proxy Statement misleading. Un-

der the same Rule 705 rationale this testimony was also admitted. However, I did not rely upon it in any way in reaching my decision on those issues as previously set forth herein.

average low price was $11.35 and the average closing price was $13.20. The average of the high-low-close price for the five-year period was $13.87, and thus just under $14, or close to UOP's closing price of $14.50 on February 28, 1978.

Also, the diversified nature of UOP's business, including its construction division, caused its earnings to be volatile and unpredictable. This is evidenced by the Come-by-Chance disaster in 1975. Its dividend performance was erratic, and even though its quarterly dividend rate had been increased five times between 1976 and 1978, the annualized rate of $.80 per share as of the first quarter of 1978 was only equal to the annual dividend paid in 1970.

Based upon an analysis of its selected comparable companies against the performance of UOP, Dillon, Read concluded that the investment value of UOP as of March 1, 1978 was probably in the range of 6.5 to 7.0 times its 1977 earnings per share from continuing operations, and in the range of 80 per cent to 85 per cent of 1977 book value. This translated into a price/earnings average value of $14.31 per share and a book value average of $16.39 per share.

The net asset value or book value was $19.86 at year-end 1977 and $20.69 as of the end of the first quarter of 1978. Net asset value was given little weight, however, in view of the fact that Signal was acquiring UOP for its ongoing business value and since there was no plan for its liquidation. I agree with this conclusion on the evidence. It corresponds with the finding in *Sterling*.

With regard to the premium, the comparable acquisition transactions selected by Dillon, Reed (as to which it used the price on the day preceding the acquisition announcement in all cases) indicated an average market value premium of 48 per cent and a median premium of 41 per cent. At the merger price of $21 paid by Signal, the premium paid over the closing market price of $14.50 on February 28, 1978 was 44.8 per cent.

From all of the foregoing, as well as the supporting statistics and documentation provided in the Dillon, Read report, there is a reasonable basis for finding that the merger price of $21 per share represented a price which was fair to the minority shareholders of UOP.

## THE STRUCTURE OF THE MERGER VOTE

Finally, I turn again to the fact that under the terms of the merger agreement entered into by the respective boards of Signal and UOP, approval of the merger and its terms required two things, namely, (1) the affirmative vote of a majority of the minority shareholders actually voting on the transaction, and (2) a sufficient expression of minority interest so that, when coupled with Signal's controlling voting position, no less than two-thirds of all outstanding shares of UOP would vote in favor of the proposal.

Quite simply, while structuring the vote in this fashion (at least in my opinion) does not free the transaction from the so-called scrutiny required of the Court, and while this factor alone does not automatically establish that Signal had discharged its fiduciary duty to the minority as a majority shareholder standing on both sides of the transaction, it does not mean that this factor is removed from further consideration by the Court. Rather, it is simply another element that must be considered as part of the overall picture in evaluating the terms of the merger for entire fairness to the minority.

When this element is added to all the other matters considered herein, I am convinced that it conclusively sways the decision in favor of the defendants. In summary, there is no indication that Signal's purpose in proposing the merger was legally improper; there is no convincing proof that there was any misrepresentation or omission of material facts in the dissemination of information by UOP or Signal; there is no evidence which indicates by a preponderance that UOP's board abdicated its fiduciary responsibility; and there is an evidentiary basis for concluding that the merger price agreed upon was fair to the minority

under the circumstances. In addition, even though others may have held a differing view, and despite the arguable nature of all of the foregoing, the final say was still submitted to the decision of UOP's minority shareholders and those who cared enough to vote gave the transaction their overwhelming approval.

## CONCLUSION

This case was tried over a period of eleven days. There are well over 3000 pages of testimony. The trial exhibits comprise several volumes. Post-trial briefing and argument has been extensive. It would be difficult to believe that anything worth arguing about has been omitted. The contentions of the parties have been thoroughly presented and considered, as the *ad nauseam* length of this decision would seem to bear out. Viewed overall, I find that the terms of the merger were legally fair to the plaintiff and the other minority shareholders of UOP.

Judgment will be entered in favor of the defendants UOP and Signal as well as in favor of the defendant Lehman Brothers. This decision makes it unnecessary to consider plaintiff's motion to enlarge the class. An appropriate form of order may be submitted.